### DICKINSON v. MATHESON MOTOR CAR CO.

(Circuit Court, M. D. Pennsylvania.    April 30, 1908.)

#### No. 116.

1. JOINT-STOCK COMPANIES—LIMITED PARTNERSHIP ASSOCIATIONS—AUTHORITY OF OFFICERS—CAPITAL STOCK.

An officer of a limited partnership association or joint-stock company has no authority to bargain away any part of its stock in consideration of services rendered by a third person in negotiating a transfer of patent rights to the company.

2. SAME—MICHIGAN STATUTES—PAROL AGREEMENT BY CHAIRMAN.

1 How. Ann. St. Mich. § 2369, provides that there shall be no liability for an amount exceeding $500, except against the person incurring it, on a debt against a limited partnership association or joint-stock company, unless evidenced by a writing signed by at least two of the managers thereof. *Held*, that a parol agreement of the chairman of such an association to issue to the plaintiff $16,000 of the common stock of the company in consideration of his services in negotiating a transfer to the company of certain patent rights was unenforceable.

**3.** ESTOPPEL—ACQUIESCENCE—ACCEPTANCE OF BENEFITS.

Where a plaintiff had no interest in certain patent rights owned by G., but only an understanding with him that the plaintiff was to receive 25 per cent. of the capital stock of any company which should be organized to exploit or induced to purchase them, and thereafter the defendant company partly through plaintiff's services was induced to purchase the patent rights from G., there was no such acceptance of benefits or retention of value contributed by the plaintiff as would preclude the company from repudiating an agreement made without authority by the chairman to issue stock to the plaintiff in consideration of his services in negotiating such transfer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, §§ 260–263.]

Motion for Judgment for Defendant Non Obstante Veredicto, on the Points Reserved.

E. N. Willard and Joseph D. Coons, for the motion.

John M. Coleman, John J. Lordan, and R. W. Rymer, opposed.

ARCHBALD, District Judge. The plaintiff sues to recover the value of $16,000 of common stock of the defendant company which he claims was to be issued to him by agreement with C. W. Matheson, chairman of the Matheson Motor Car Company, Limited, a partnership association organized under the laws of Michigan, of which the defendant company, a corporation of the state of Pennsylvania, is the lawful successor. The jury have found in the plaintiff's favor, and the agreement must therefore be assumed to have been made. The circumstances attending it will be stated presently. No direct authority from the company to enter into it is shown, and, on the contrary, the right to do so is expressly negatived. Neither is there anything from which it could be implied; it being entirely beyond the authority of an officer of the company to bargain away any part of its capital stock in the manner relied on. But, more than that, it is provided by the statute of Michigan under which the Matheson Motor Car Company, Limited, was organized, that:

"No liability for an amount exceeding $500, except against the person incurring the same, shall bind the said association, unless reduced to writing and signed by at least two managers." 1 How. Ann. St. (Mich.) § 2369.

This is decisive of the case unless it can be obviated; every one dealing with an association of this kind being affected with notice of the limitations so imposed. Citizens' Saving Bank v. Vaughan, 115 Mich. 156, 73 N. W. 143; Rhoades v. Malta Vita Co., 149 Mich. 236, 112 N. W. 940; Melting Co. v. Reese, 118 Pa. 355, 12 Atl. 362; Andrews v. Youngstown Coke Co. (C. C.) 39 Fed. 353; Bernard Mfg. Co. v. Packard & Calvin, 64 Fed. 309, 12 C. C. A. 123. It is contended, however, by the plaintiff that, having obtained the benefit of the transaction, the company is not in a position to repudiate it upon the well-known principle that one who accepts the results of that which has been done in his behalf is estopped from asserting that it was done without authority; or, as it is sometimes put, that the retention of the fruits of a transaction amounts to a ratification. 16 Cyc. 787; 1 Am. & Eng. Encycl. Law (2d Ed.) 1196; MacGeorge v. Chemical Co., 141 Pa. 575, 21 Atl. 671; Interstate Insurance Co. v. Brownback, 1 Pa.

Super. Ct. 183. The case turns, therefore, on whether that can be said in the present instance, which depends upon the following circumstances:

In the summer of 1903 Charles R. Greuter, an experienced mechanical engineer of Holyoke, Mass., and the designer and owner of certain patented motor car appliances, had his attention called to an advertisement in the "Motor Age" of a party who was looking for a reliable four-cylinder gasolene motor. Mr. Dickinson, the plaintiff, a salesman of considerable business ability, with whom he had been acquainted for a couple of years, had been endeavoring for some time to interest different motor car companies and capitalists to take over Mr. Greuter's patents and manufacture under them; it being understood that Dickinson was to receive 25 per cent. of the capital stock secured in any company which should be organized or induced to do so. His efforts in that direction, however, had not proved successful, and Mr. Greuter meanwhile had become somewhat involved, the automobile business which he was conducting at Holyoke not proving remunerative. Finding out, through Mr. Dickinson's assistance, that the parties who were back of the advertisement, which was not disclosed by it, were the Matheson Motor Car Company, Limited, of Grand Rapids, Mich., it was arranged that Mr. Dickinson should go out there and interview them, and see what could be done, securing positions for both Greuter and himself, if possible, and disposing of the patents. An appointment with the Matheson people having been obtained, Dickinson went out to Grand Rapids with such success that the Matheson people were persuaded to send two of their representatives East, Mr. C. W. Matheson, their chairman, and Mr. G. J. Barrett, their mechanical engineer, to see Mr. Greuter and examine the car which he had built. Meeting Mr. Greuter and Mr. Dickinson in New York the latter part of July, 1903, they were given a demonstration of the car by Mr. Greuter, and were finally taken in it to Holyoke, Mass., being so well pleased as the result that they were ready to enter into negotiations with regard to it. Different propositions were discussed while they were there together at Holyoke, but nothing definite was arrived at. The thing on which they seemed to split was the employment of Dickinson. The Matheson people wanted Greuter and his patents and car, but they had no use for Dickinson as salesman, at least not at that time, although the possibility was held out that they might have later. A final proposition, however, was submitted in writing by Dickinson, in the name of Greuter—either while they were still together at Holyoke, according to Dickinson, or after they had reached New York, according to Matheson, where he and Dickinson went the same evening—by which the company was to employ Greuter and take over his patents, giving him $6,000 in cash and notes, and agreeing to pay him an annual salary of $2,000, with $2,000 a year of the common stock of the company additional, guaranteeing from these two sources an average income of at least $3,600 per annum, and giving him also besides that the earnings on $40,000 of common stock, to be retained in the treasury. "This proposition," as it was therein declared at the close, "anticipates the employment by you of F. S. Dickinson (to whom 40 per cent. of all earnings on $40,000 of common stock, as above mentioned, is to be made

payable) upon my recommendation at such time and reasonable salary as I may suggest. [Signed] Charles R. Greuter, per F. S. Dickinson." This was on July 30, 1903, and the proposition, so made, Matheson took home with him, and later telegraphed to both Greuter and Dickinson that it was accepted with slight modifications. Up to this point it had been assumed by the Matheson people that Dickinson was a joint owner with Greuter; it having been so represented by Dickinson on his visit to Grand Rapids, where he stated that he had a 40 per cent. interest, and the same idea being carried out in the negotiations which followed. But, upon writing to Greuter after the last proposition, they were informed that this was not the case, and that he had no claim or title to any of Greuter's inventions or property, there being simply a verbal agreement between them, by which Greuter was to assign him a certain percentage of the stock which he might acquire in any company that took over Greuter's patents. Upon being advised of this, they at once entered into negotiations with Greuter direct, with the result that on August 11, 1903, they closed a contract with him substantially in accordance with the last proposition submitted, except that Dickinson was eliminated. By it Greuter signed and conveyed to the company his patents, inventions, working drawings, and property in the shop at Holyoke, and agreed to enter into the service of the company as mechanical engineer and designer for the term of five years, the company agreeing to pay him a certain amount in hand, and to employ him at a salary of $2,000 a year. He was also to get $2,000 a year of the common stock, and the dividends which should be declared on $40,000, the company guaranteeing that the income to him from all these sources should amount to at least $3,600 per annum. The next day, at New York, in pursuance to directions by telegram from Greuter, Mr. Dickinson turned over to Mr. Matheson such drawings and papers as were in his hands, meeting him for the purpose at the Park Avenue Hotel. On this occasion, according to Dickinson, the following colloquy occurred:

"Q. What conversation, if any, did you have with Mr. C. W. Matheson there?

"A. He told me he had closed a contract with Mr. Greuter, and I asked him if the terms of it were in accordance with the last proposition we talked over. He told me the portion relating to my employment had been stricken out; and I questioned him upon the delivery of the stock to me as agreed.

"Q. What did he say about that?

"A. He said it would be done.   *   *   *

"Q. Well, how much?

"A. Forty per cent. of $40,000."

And again on cross-examination:

"Mr. Matheson informed me that he had closed a contract with Mr. Greuter to take over his patents and to employ him as superintendent. And I asked if the contract provided for the payment of 40 per cent. of $40,000 in common stock to me, and he said that that would be taken care of; that I would be given the stock.

"Q. Did he tell you, when he said that a contract had been completed between himself and Greuter, what the terms of that contract were?

"A. They eliminated my services.   *   *   *

"Q. Did he tell you anything at all about the contract?

"A. Only that he had closed a contract, and it was in accordance with our last proposition submitted in Holyoke, except so far as my employment was con-

cerned, and led me to believe that I would get my compensation as agreed upon." ·

The occurrence at Holyoke, July 30, to which allusion is made, was given by him as follows:

"Q. Now, were there any other propositions discussed during that day?

"A. There were several. * * *

"Q. What did you finally do? What was the result of this thing? * * *

"A. The various propositions were discussed, and the portion of the last proposition made, by which the earnings of the company [on $40,000 of stock] were to be given to Mr. Greuter, with 40 per cent. to myself, was to be eliminated. * * *

"Q. What, if anything, was said by and between you and Mr. Greuter and Mr. Matheson in reference to the compensation to you?

"A. I was to get 40 per cent. of $40,000 of common stock. * * * They said they would give me 40 per cent. of $40,000 in common stock.

"Q. Who said that?

"A. Mr. Charles Matheson, under directions from Mr. Greuter.

"Q. What, if anything, did Mr. Greuter say about this 40 per cent. of $40,000?

"A. He directed Mr. Matheson to have it made out to me and delivered to me. * * *

"Q. What, if anything, did Mr. Matheson say to that request?

"A. He agreed to it.

"Q. What did he say?

"A. He said that he would deliver 40 per cent. of $40,000 in common stock to me."

The subject being brought up again on cross-examination, he further testified:

"Mr. Greuter and Mr. Charles W. Matheson were present. It was in the factory of the Holyoke Automobile Company. * * * The proposition as last put up to them at that time embodying my employment was not satisfactory to them. They did not care to be burdened with the expense that I would be. They had no use for my services at that time, and, for that reason, I demanded that I get substantial compensation immediately for my services in the matter, and I demanded that 40 per cent. of the $40,000 in common stock be made out to me and delivered to me, which Mr. Greuter directed Mr. Matheson to do.

"Q. What did Mr. Greuter say?

"A. He told Mr. Matheson to make out or to have made out stock to the amount of $16,000 to me and delivered to me."

It is upon what was so said at Holyoke on July 30th, between Matheson, Greuter, and Dickinson, confirmed by the assurance given by Matheson to Dickinson at the Park Avenue Hotel, New York, on August 12th, that Dickinson relies to make out the agreement sued on. Assuming that, taken together, it is sufficient to establish an undertaking by Mr. Matheson, as chairman of the Matheson Motor Car Company, Limited, in behalf of the company, to issue $16,000 of common stock to Mr. Dickinson, the question is whether the company is liable. That it would not be, under ordinary circumstances, in view of the Michigan statute, is conceded. It is claimed, however, as already stated, that having got the benefit of that which was done in its behalf, which it retains, the company is estopped from denying its responsibility. But a careful examination of the case fails to disclose anything on which an estoppel of that kind is able to be predicated. All that the plaintiff had

to command in the negotiations, and all therefore that he could claim to have contributed to the transaction were his services, which were not rendered for the company, but solely for himself and Greuter. He had no interest in Greuter's patents or inventions, although he represented otherwise; the arrangement with Greuter simply providing that he should have a certain percentage of the stock, secured in any company which should buy or be organized to exploit them. When, therefore, the Matheson people took over this property, they took nothing belonging to Dickinson which they can now be said to retain to his detriment. Greuter as the sole owner was at perfect liberty to dispose of his belongings to the company in the way he did, and the company owed no duty to Dickinson to consider him, after it was discovered that he had no interest, except as a matter of courtesy. Under his promise, Greuter no doubt became answerable to Dickinson, and still continues to be so, but the company did nothing to interfere with this. That his services were rendered solely in the interest of Greuter and himself there can be no question. Asked, at the trial, why the two written propositions, which were submitted, were signed by him in Greuter's name, if Greuter was present, he said: "Because I was acting as selling agent." And this he reiterates. In no sense in anything that he did was he acting in the interest of the company, and the only advantage which it got out of what he did was as he, for the benefit for Greuter and himself, sought the company out, and endeavored to make a bargain with it, by which, out of that which it was to pay or part with, he and Greuter would be benefited. From the standpoint of the company, this was entirely voluntary and unsolicited, for which upon no consideration can it be made responsible. The jury were virtually so instructed at the trial, although the question of fact supposed to be involved, as to whether, after all, there was anything of value, contributed by the plaintiff, which the company retained, by which it would be estopped, was left for them to pass upon, of which, if there was any evidence, the verdict would have to be respected. But, putting the case as strongly for the plaintiff as it is possible, it is clear that there is nothing of which this can be said, and a verdict for the defendant should therefore have been directed as requested.

Proceeding to do this now, it is ordered that judgment be entered for the defendant on the question reserved non obstante veredicto.